Tibor Nagy, Jr., SBN 007465
Nonnie L. Shivers, SBN 023460
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:  (602) 778-3700
Fax:  (602) 778-3750
Tibor.Nagy@OgletreeDeakins.com
Nonnie.Shivers@OgletreeDeakins.com
Attorneys for Defendant CoxCom, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sheila C. Campbell-Thomson,<br><br>           Plaintiff,<br><br>vs.<br><br>CoxCom, Inc., a Delaware corporation, d.b.a. "Cox Communications,"<br><br>           Defendant. | No. CV08-01656-PHX-GMS<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

The sole question before the Court is whether Cox retaliated against Plaintiff due to her complaints about overtime.  Plaintiff's kitchen sink Response is nothing more than a desperate attempt to manufacture a fact issue by inundating the Court with wholly extraneous facts such as whether Cox paid Plaintiff overtime while she worked in Customer Loyalty or purportedly committed "wage theft," how Plaintiff's performance was evaluated by Cox years before she joined Customer Loyalty or whether Plaintiff's co-workers perceived her to possess adequate cable installation skills.  Such irrelevant "evidence," coupled with Plaintiff's wild speculation and conspiracy theories devoid of any evidentiary support, however, amount to nothing more than an impermissible attempt to use the FLSA as a vehicle for after-the-fact judicial review of the soundness of Cox's business decision to terminate Plaintiff for failing 12 audits.  The Court should grant Cox

summary judgment as to Plaintiff's claims[1] because Plaintiff failed to raise any material issue of fact via either direct or circumstantial evidence connecting her termination (or any other purported adverse action) to her complaints.

**I.     No Direct Evidence Exists Showing That Cox Terminated Plaintiff Due To Her Overtime Complaints.**

Plaintiff's attempt to avoid summary judgment by relying on alleged "direct" evidence of retaliation fails as a matter of law. Direct evidence consists of clearly retaliatory statements or actions by the employer. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus."). Evidence is direct only if it "proves the fact of discriminatory animus without inference or presumption." *Godwin v. Hunt Wesson*, 150 F.3d 1217, 1221 (9th Cir. 1998); *Konrath v. Amphitheater Unified Sch. Dist.*, 2007 WL 2809026, at *19 (D. Ariz. Sept. 26, 2007). Regardless of whether Plaintiff relies on direct evidence to meet her burden or relies on the *McDonnell Douglas* burden shifting approach, Plaintiff still bears the burden of countering Cox's explanation for each purported adverse employment action. *Spata v. Smith's Food & Drug Ctrs.*, 253 Fed. Appx. 648, 649 (9th Cir. 2007).

First, Plaintiff's allegation that Mr. Williams screamed at her and called her a "f***ing bitch" during the April 5, 2006 team meeting is neither direct nor circumstantial evidence of retaliation. Plaintiff admits that explicatives were rampant during the volatile meeting. [DSOF/RDSOF ¶¶ 114-15.] Plaintiff was neither singled out nor treated differently than the other members of the team at the meeting. Given that Plaintiff's and Mr. Williams's personal animosity dated back to their first month working with one

---

[1] Cox also requests that the Court enter summary judgment on Plaintiff's claim for tortious interference on the grounds set forth in Section II(E) of its Motion for Summary Judgment [Doc. No. 40] as Plaintiff's Response failed to oppose any of Cox's bases for summary judgment. Further, Cox filed a motion requesting a brief three-page extension for its Reply but has not yet received a ruling from the Court. In the event Cox's request is denied, Cox requests leave to file a condensed brief in conformance with Local Rule 7.2(e).

1 another arising from incidents wholly unrelated to her overtime complaints, this isolated
2 comment does not constitute direct or indirect evidence that Cox retaliated against Plaintiff
3 as a result of her protected activity. *See, e.g., Barnett v. Dep't of Veterans Affairs,* 153
4 F.3d 338, 342-43 (6th Cir. 1998) (use of word "bitch" by supervisor who made it known
5 that he disliked plaintiff consistent with personal dislike not illegal animus); *Behnia v.*
6 *Shapiro,* 1998 WL 381041, at *3 (N.D. Ill. July 1, 1998) (supervisor's comment that "I
7 hate that worthless Arab son of a bitch" not direct evidence but stray comment); *see also*
8 *Mickelson v. New York Life Ins. Co.,* 460 F.3d 1304, 1318 (10th Cir. 2006). Moreover,
9 there is no causal link between Mr. Williams's comment and any of the alleged adverse
10 employment actions. Mr. Williams did not fire Plaintiff in April 2006 for walking out of
11 the meeting and his one-time comment bears absolutely no correlation to Plaintiff's
12 termination nine months later for failing 12 audits or to the zone changes and bidding
13 system that Mr. Williams had proposed in January 2006 – four months prior to his alleged
14 comment. [DSSOF ¶ 5.]

15 Likewise, Mr. Williams's purported comment that he wanted to fire Plaintiff
16 because she walked out of the meeting is not evidence of retaliation. As Plaintiff herself
17 admits, Mr. Williams twice stated he wanted to fire Plaintiff <u>for her conduct of walking out
18 of the meeting</u>, not because of her overtime complaints. [RDSOF ¶¶ 118-119.]
19 Mr. Williams's comment also occurred over nine months before Cox terminated Plaintiff
20 for failing 12 audits and no evidence shows his stray, isolated remark figured into the
21 termination decision-making process in any way. Mr. Williams's comment is indicative of
22 nothing more than Mr. Williams's and Plaintiff's personal dislike for one another. From
23 the time they began working together in December 2005, Plaintiff's working relationship
24 with Mr. Williams was rife with personal conflict. [SSOF/RDSOF ¶¶ 18-21.] Their
25 relationship was so acrimonious from the beginning that Mr. Williams expressed to other
26 employees on numerous occasions between December 2005 and April 2006 that he wanted
27 to fire Plaintiff as a result of their personal conflicts unrelated to and predating any of her
28 overtime complaints. [DSOF/RDSOF ¶¶ 22-24.]

3

Finally, the alleged temporal proximity between her DOL complaint in August 2006 and Cox purportedly beginning "false audits" two months later is neither direct nor indirect evidence of retaliation. Temporal proximity between reporting an FLSA concern and an alleged adverse employment action does not constitute direct evidence. *Pettit v. Steppingstone Ctr.,* 2009 WL 3152954, at *2 (E.D. Mich. Sept. 30, 2009) ("temporal proximity is certainly not direct or 'patent' evidence of retaliation"). Moreover, Plaintiff's distortion of the timing of her alleged DOL complaint (of which Cox never received any confirmation and had no knowledge of until this lawsuit) and the Mentors' random audits also fails to evidence retaliation. Plaintiff must but has not demonstrated that Trujillo or Williams knew of her alleged complaint to the DOL. This requirement is nothing more than "common sense" because a "decision-maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 799 (11th Cir. 2000); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997). Likewise, Plaintiff's unsupported assertion the "false audits" started within two weeks of Ms. Ormont learning about her purported DOL complaint in August 2006 is patently false. Plaintiff asserts that she filed a complaint with the DOL in August 2006 and informed Ms. Ormont later that same month of her purported complaint. [RDSOF Exh. 1, p. 225:16-22, 234:5-12.] The reality is that there were no "false audits" – Plaintiff's accounts were randomly audited by the same two Mentors using the same 10 questions between October 24, 2005 (one month after she began working in Customer Loyalty) and her termination in January 2007. [DSOF Exh. 6.] The routine QA audits conducted in December 2006 – over four months after Plaintiff allegedly complained to the DOL and told Ms. Ormont about her complaint – led to her termination. [DSOF Exhs. 19-21.]

**II.     Plaintiff's Circumstantial Evidence Fails to Connect Her Complaints To Any Of The Alleged Adverse Actions.**

To survive summary judgment with only circumstantial evidence, Plaintiff must produce both "specific" and "substantial" evidence proving that *but for* Cox's retaliatory animus, Plaintiff would not have been terminated for failing 12 audits or subjected to any

4

1  other purported adverse actions. *Godwin,* 150 F.3d at 1222. Plaintiff misstates what
2  constitutes an adverse action by relying upon Ninth Circuit case law overturned by the
3  Supreme Court's decision in *Burlington*. Specifically, *Burlington* overturned the Ninth
4  Circuit standard of "adverse action" articulated in *Ray v. Henderson*, 217 F.3d 1234, 1241
5  (9th Cir. 2000) and on which Plaintiff relies in her Response. *See Leilaind v. City &*
6  *County of San Francisco,* 576 F.Supp.2d 1079, 1096 n.6 (N.D. Cal. 2008). Under
7  *Burlington*, only an act that is likely to "dissaude[] a reasonable worker from making or
8  supporting a charge of discrimination" can possibly rise to the level of an adverse
9  employment action. 548 U.S. at 68. As set forth below, the fact that Plaintiff continued to
10 be undeterred in complaining demonstrates that Cox's purported actions were not
11 sufficiently material or adverse to be actionable.

12       Plaintiff also argues that she need not show a prima facie case of retaliation because
13 Cox has articulated a legitimate, non-retaliatory reason for each of the purportedly adverse
14 actions. Once again, Plaintiff misrepresents the law to the Court. The D.C. Circuit merely
15 held that where a plaintiff in a Title VII disparate treatment case has shown that she
16 suffered an adverse employment action and established a causal link between the protected
17 activity and the purported adverse action, it may be unnecessary for a court to decide
18 whether the plaintiff has made out a prima facie case if the employer articulates a
19 legitimate, non-discriminatory reason for the demonstrated adverse action. *See Brady v.*
20 *Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008). Here, Plaintiff cannot
21 evade her burden to show a prima facie case because none of Cox's purported actions
22 constitutes adverse actions (aside from Plaintiff's termination) or have any causal
23 connection to Plaintiff's protected activities. *EEOC v. Creative Networks,* 2010 WL
24 276742, at *8-9 (D. Ariz. Jan. 15, 2010).

25    **A.   Plaintiff's Retaliation Claim Fails Because The Team-Wide Rezoning**
26         **And Bidding Process Does Not Constitute An Adverse Action.**

27       First and foremost, no evidence whatsoever supports Plaintiff's allegation that Cox
28 "assigned" or "gave" Plaintiff a zone during the April 2006 team-wide zone bidding

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016

5

process. As Plaintiff herself admits, <u>all</u> CLRs on Mr. Williams's team personally selected their own zone from the zones available at that stage of the bidding process.[2] [DSOF/RDSOF ¶ 93.] Plaintiff does not dispute that she could have bid on numerous other zones, including a zone in affluent Fountain Hills that was geographically contiguous. [DSOF/RDSOF ¶ 96.] The simple fact of the matter is that Plaintiff herself chose not to bid on the other zones available to her as a result of her own personal preferences (e.g. the zone was further from her home and she had time management issues). [*Id.*] Any adverse consequences Plaintiff experienced were a direct result of her own actions and preferences, not Cox's.[3]

Second, it is undisputed that the rezoning process resulted in changes to multiple zones, not just Plaintiff's zone. [DSOF/RDSOF ¶ 76.] Indeed, Plaintiff admits that at least <u>four</u> zones were altered as a result of the rezoning created and implemented by Mentor Courtney, CLRs McCluskey and Morris, and Mr. Williams. [*Id.*] This group collectively looked at historical data for each zone and tired to divide up the zones to equal out workloads and provide equal opportunities to earn income. [DSOF/RDSOF ¶¶ 81-82.][4]

---

[2] Plaintiff's unsupported assertion that CLR Keith Demarest had his zone "taken" as part of the zone bidding process is equally unfounded. Just like Plaintiff and every other CLR on Mr. Williams's team, Mr. Demarest selected his own zone during the bidding process based on objective stacked rankings based on the previous quarter's sales, saves and disconnects. [DSOF/RDSOF ¶ 93.]

[3] Plaintiff also makes the unsupported assertion that Mr. Trujillo purportedly "did nothing" after she complained to him about the zone she voluntarily selected. Other than her own speculation, Plaintiff presents no evidence whatsoever regarding actions taken by Mr. Trujillo to address her complaint. Plaintiff's naked allegations and speculation are insufficient to create a material fact issue precluding summary judgment. *Roley v. New World Pictures,* 19 F.3d 479, 482 (9th Cir. 1994). Moreover, the fact that Plaintiff voluntarily selected the zone she complained about when others were available to her, and then selected the same zone again in July 2006, establishes that Cox did not subject Plaintiff to any adverse action.

[4] Plaintiff attempts to rely on maps (RDSOF Exh. MM) never produced during discovery and lacking any foundation to purportedly show the areas falling within her initial zone and the zone she bid on. It is well settled that "only admissible evidence may be considered by the court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988). Cox requests that the Court exclude Exh. MM.

Plaintiff has offered no evidence whatsoever to rebut these legitimate, non-retaliatory reasons for reconfiguring no less than four zones.

Finally, Plaintiff provides no evidentiary support for her speculative argument that the "stacked rankings" used to determine bidding order were changed after the April 2006 meeting in which she and others complained. Plaintiff testified that when Mr. Williams announced the zone bidding and zone reconfigurations to all CLRs, he stated stacked rankings of each CLRs' saves, sales and disconnects would be used to determine bidding order. [DSOF/RDSOF ¶ 74.] Indeed, Mr. Williams proposed using these very same rankings in January 2006 – four months before Plaintiff's first overtime complaint. [DSSOF Exh. 2, ¶¶ 26, 28.] These were the same objective, stacked rankings used to determine bidding order for every CLR on Mr. Williams's team, as well as other teams. [DSOF Exh. 4, ¶ 26, DSSOF Exh. 2, ¶¶ 28, 30.**]** Another team leader who heard about Plaintiff's complaints about her zone confirmed that Plaintiff had been ranked correctly based on her number of sales, saves and disconnects for the previous quarter. [DSSOF Exh. 2, ¶ 36.] None of the "evidence" Plaintiff points to relates in any way to the stacked rankings used for bidding. For example, Plaintiff makes the unsupported assertion that Exhibit VV to Plaintiff's RDSOF was used for stack rankings, even though it is impossible to discern from Exhibit VV the date these statistics were created, the time period these statistics pertain to or that Cox in any way used these statistics for ranking purposes.

### B. Field's Refusal To Permit Plaintiff's Transfer Does Not Constitute Retaliation.

Plaintiff admits that she needed permission from both Customer Loyalty and Field leaders in order to transfer back to Field, and that Customer Loyalty granted her the authorization she needed to transfer back to Field under Cox's policy even though she had complained about overtime and the Daily Planner. [DSOF/RDSOF ¶¶ 39-40.][5] In light of

---

[5] DSOF ¶¶ 39-40 details Cox's policy regarding internal transfers and Mr. Trujillo's granting permission for Plaintiff to transfer to Field. Absent any support whatsoever, Plaintiff labels these statements as "immaterial," yet then claims that Cox's refusal to

Continued on Next Page

this uncontroverted evidence demonstrating that Customer Loyalty paved the way for the internal transfer Plaintiff sought, Plaintiff now speculates that Field leaders knew of her complaints and must have retaliated against her.

First, Plaintiff has not offered a scintilla of evidence that anyone in Field knew about her complaints in Customer Loyalty. Indeed, Mr. Dolezal attested that he had no knowledge of any complaints Plaintiff made about overtime, the Daily Planner or even about Mr. Williams, when he informed Cox HR he was uninterested in taking Plaintiff back into Field. [DSOF ¶ 52; DSOF Exh. 13, ¶ 10.] Plaintiff asserts in RSDSOF ¶ 44 that Mr. Dolezal and Mr. LaSpisa knew of her complaints about overtime, but fails to offer any record evidence for this wholly unsupported assertion. Plaintiff's circular argument that Cox Human Resources' knowledge of her complaints must be imputed to Field because HR worked with Field to obtain permission for her to transfer is not based in the law or facts of this case. Plaintiff must show (but clearly has not) that the purported retaliators were aware of Plaintiff's protected conduct. *Raney,* 120 F.3d at 1197; *Brungart,* 231 F.3d at 799.

Second, Plaintiff's argument that Field's refusal to authorize her transfer was inconsistent with her Field performance evaluations fails to create a fact issue precluding summary judgment because no connection exists between her evaluations and transfer authorization. Field's refusal to permit Plaintiff to transfer back were based on legitimate, non-retaliatory reasons unrelated to Plaintiff's performance evaluations, including the fact that Field was over head-count and concerns about Plaintiff's ability to do the job. [DSOF ¶ 44, DSOF Exh. 13 ¶¶ 7, 8.][6] Plaintiff's evaluations say nothing about whether Field

---

transfer her back to Field constitutes an adverse action. Pursuant to LRCiv 56.1(b), DSOF ¶¶ 39-40 are deemed admitted because Plaintiff has not controverted these statements of fact.

[6] In RDSOF ¶ 44, Plaintiff objects to DSOF ¶ 44 as hearsay and lacking foundation. Plaintiff fails to provide any explanation underlying these objections. DSOF Exh. 11 is admissible evidence under the business records exception articulated in FRE Rule 802(6). Furthermore, Mr. Dolezal's affidavit signed and sworn under penalty of perjury provides ample foundation for DSOF ¶ 44 and DSOF Exh. 11.

would rehire Plaintiff or wanted her back in the department.  Moreover, Mr. Dolezal and Mr. LaSpisa did not even complete the evaluations Plaintiff purports to rely upon.  [*See* DSSOF Exhs. D-F.]

Finally, Plaintiff's attempt to cast Mr. Dolezal's affidavit and the May 2006 e-mail between Cox HR personnel (DSOF Exh. 11 and 13 respectively) as adverse actions because they contain some "sudden, unfounded defamatory information" about Plaintiff fails to create a material fact issue.  Plaintiff fails to specify precisely what is defamatory and how it could possibly rise to the level of an adverse action.  Exhibits 11 and 13 contain nothing more than Mr. Dolezal's and Mr. LaSpisa's opinions as to their experience with Plaintiff while she worked in Field and why they did not desire her to return to the Field.  Under Plaintiff's tortured reading of the law, every opinion offered about an employee or refusal to allow someone to transfer back would be retaliatory.

### C. Plaintiff Introduced Not Even A Scintilla Of Evidence Connecting Her Termination For Failing 12 Audits To Her Complaints.

Plaintiff admits that the CLRs were not only aware, but were also expressly warned that completing false disconnects constituted a terminable offense, and that other CLRs on Mr. Williams's team were terminated for such conduct.  [DSOF/RDSOF ¶¶ 132-135.] Plaintiff further admits that she could not prove she completed the work on the 12 failed audits that led to her termination, despite submitting some documentation she personally believed might exonerate her.  [DSOF/RDSOF ¶ 164.]  In light of these undisputed facts, the sole question for the Court to decide is whether decision makers Williams and Trujillo terminated Plaintiff based on an honest belief that Plaintiff failed 12 audits.  Plaintiff attempts to turn this standard on its head by arguing that Cox must prove Plaintiff actually failed to complete the 12 audits.  Cox need not prove Plaintiff actually failed the audits, only that the decision makers honestly believed she did – even if that belief was erroneous, foolish or even baseless.  *See Kariotis v. Navistar,* 131 F.3d 672, 676 (7th Cir. 1997).

Plaintiff's "evidence" does not in any way show that Trujillo and Williams did not possess an honest belief that she failed 12 audits – the sole reason for her termination.

1  First, Plaintiff's assertion that photographs taken by Cox of some of the failed audits were
2  not shown to her is wholly irrelevant to Trujillo's or Williams's honestly held belief that
3  Plaintiff failed the audits.  Plaintiff fails to articulate how or why the non-disclosure of the
4  pictures impacts Cox's honestly held belief or evidences pretext in any way, especially in
5  light of Plaintiff's admission that Trujillo and Williams provided her with a list of failed
6  accounts, discussed them with her and afforded her the opportunity to provide
7  documentation to them related to the 12 failed audits prior to her termination.[7]
8  [DSOF/RDSOF ¶ 154.]

9  Second, Plaintiff makes the unsupported assertion that Cox fabricated the pictures
10 Mr. Courtney took of some of the 12 failed audited accounts.  Mr. Courtney provided
11 sworn testimony that he audited Plaintiff's accounts by personally visiting each of the sites
12 and that he took the photographs of some of the failed accounts he audited.  [DSOF ¶¶ 143,
13 146.]  On the other hand, Plaintiff's accusation that Cox manufactured the pictures is
14 "supported" only by Plaintiff's rank speculation and conspiracy theories.  The fact that the
15 audit pictures bear slightly different dates than the dates that Mr. Courtney completed the
16 audit reports does not in any way show the pictures were fabricated by Cox, but merely that
17 Mr. Courtney may have taken the pictures and then completed the audit report (a
18 completely logical order) or even that the camera date may have been incorrect.
19 Regardless, Plaintiff has introduced no evidence showing that Trujillo and Williams did

---

[7] Likewise, the fact that Mr. Williams drafted the Termination Review memorandum to Mr. Trujillo on January 2, 2007 recommending Plaintiff's termination for failing 12 audits and then subsequently discussed his recommendation with Ms. Ormont does not evidence pretext.  [DSOF ¶¶ 150-51.]  Mr. Williams relied on documentation regarding 12 failed audits provided to him by the Mentors in making his recommendation.  [DSOF ¶¶ 148, 150.]  Mr. Williams and Mr. Trujillo met with Plaintiff a few days later and apprised her with specificity of each of the 12 failed audits, discussed the failed audits with her in detail and encouraged her to submit any documentation in her possession.  [DSOF ¶¶ 152, 154-55, 157.]  Plaintiff asserts that Mr. Williams did not have the authority to fire her – she cannot have her cake and eat it too by arguing that his *recommendation* to fire her was pretext if he was incapable of taking such an adverse action.  [RDSOF ¶ 22.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016

1  not honestly believe the pictures evidenced Plaintiff's failed audits – even if that belief was
2  erroneous.

3        Third, Plaintiff asserts that Cox has presented no evidence that Trujillo or Williams
4  talked to Loss Prevention after she provided them with theft reports regarding two of the
5  12 failed audited accounts. Plaintiff's subjective, personal belief that Cox did not complete
6  a thorough enough investigation into her failed audits is not specific and substantial
7  evidence of pretext and does not cast doubt on Mr. Williams's or Mr. Trujillo's honestly
8  held belief that she failed the 12 audits.

9        Fourth, Plaintiff's assertion that she failed an audit after each alleged complaint is a
10 red herring because Plaintiff never suffered any adverse action as the result of any of the
11 audits she failed over the course of her time in Customer Loyalty, except for the audits
12 leading to her termination. Mr. Courtney followed up with Plaintiff about failed audits in
13 May 2006 but she received no disciplinary action, suffered no adverse consequences and
14 continued to complain. [DSOF ¶¶ 137-138.] Likewise, Plaintiff has presented no evidence
15 connecting her November 2006 interview with two Cox HR representatives and the 12
16 failed audits discovered by Mentors Courtney and Morrison. There is simply no evidence
17 showing that Williams or Trujillo (or the Mentors who completed the audits) knew about
18 Plaintiff's interview with HR in November 2006 and, therefore, no causal connection
19 exists between the two. Timing alone is neither "specific" nor "substantial" evidence of
20 retaliatory animus sufficient to survive summary judgment. *Yount v. Regent Univ.,* 2009
21 WL 995596, at *9 (D. Ariz. April 9, 2009).

22       Finally, for the first time in her Reply, Plaintiff's raises the new allegation that Cox
23 acted adversely because it did not follow regular "policy" for audits . No written "policy"
24 governing audits existed in Customer Loyalty. Moreover, Plaintiff has not introduced
25 testimony from the Mentors or anyone else involved in auditing the CLRs' work
26 evidencing any "policy" in following up on failed audits. The fact that Mr. Courtney
27 followed up with Plaintiff on one occasion and followed up with CLR Cotton on another
28 occasion does not create a "policy." Even if such an informal practice existed, Plaintiff

11

1  admits she was given an opportunity to explain the 12 failed audits and visited the sites –
2  precisely what occurred when Plaintiff and Mr. Cotton failed audits.

3        **D.    Plaintiff Failed To Introduce Even A Scintilla Of Admissible Evidence
4              Showing Cox "Blackballed" Her With Contractors.**

5        Plaintiff's Response illustrates precisely why her "blackballing" theory of retaliation
6  fails as a matter of law: she offers no admissible evidence whatsoever demonstrating that
7  any Cox contractor refused to hire her after her termination due to Cox's alleged
8  references. First, Plaintiff admits that three of the contractors (End2End, Cable Enterprises
9  and Sunshine Installations) never told her that they spoke with anyone at Cox or that Cox
10 said she was in unhirable status. [DSOF/RDSOF ¶¶ 194-95, 197-98, 200-01.] The reality
11 is that these three contractors may have chosen not to hire Plaintiff for any number of
12 reasons wholly unrelated to her employment at Cox. She failed to produce any evidence
13 (whether documentation or deposition testimony) from any of the contractors to support her
14 conspiracy theory. Plaintiff's only "evidence" correlating the contractors refusal to hire her
15 is her own speculation and conjecture, which is insufficient to create a material fact issue
16 precluding summary judgment. *See Memnon v. Clifford Chance,* 2009 WL 3459188, at *6
17 (S.D.N.Y. Oct. 27, 2009).

18       Second, Plaintiff relies on nothing more than inadmissible hearsay evidence in a
19 futile attempt to show that two other contractors – Micor and TriWire – failed to hire her
20 after they reportedly contacted Cox and were allegedly informed she was in "unhirable"
21 status with Cox. Plaintiff ignores the clear, binding precedent that her own testimony as to
22 what Cox purportedly told the contractors is inadmissible hearsay upon hearsay evidence
23 and cannot be considered on summary judgment. [Doc. No. 40, p. 16: 8-26.] Even if this
24 hearsay was admissible (which it clearly is not), Plaintiff has produced no evidence
25 showing that Cox's references were pretext for retaliation as Cox honestly believed that
26 Plaintiff had been fired for failing 12 audits.

27       Plaintiff also argues that Cox retaliated against Plaintiff by "dissemintat[ing] false
28 allegations" about her to ADES. Plaintiff fails to identify the alleged false allegation,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016

1 leaving to Defendant and the Court the task of piecing together her argument for her. Presumably, Plaintiff is alluding to Cox's challenge of her eligibility for unemployment benefits because she had failed 12 audits. [DSOF Exh. 29.] As set forth in detail in Cox's Motion for Summary Judgment, Cox's actions do not constitute an adverse employment action or retaliation as Cox was entitled to challenge Plaintiff's entitlement to benefits with ADES and Cox held the honest belief that Plaintiff failed 12 audits. [Doc. No. 40, Section II(D).]

### III.     Plaintiff Cannot Recover Punitive Damages Under The FLSA.

Plaintiff incorrectly asserts that punitive damages are "clearly available" under the FLSA's retaliation provision, Section 216(b), based on the Ninth Circuit's ruling in *Lambert v. Ackerly,* 180 F.3d 997 (9th Cir. 1999). Plaintiff's argument misstates both the law and the Court's holding in *Lambert*. The Ninth Circuit expressly acknowledged in *Lambert* that it did not reach (let alone decide) the issue of whether punitive damages are available under Section 216(b) because the defendant waived the issue by failing to contest the availability of punitive damages in the district court. 180 F.3d at 1011. Plaintiff also conveniently glosses over the fact that the Ninth Circuit issued the *Lambert* decision before the Eleventh Circuit issued its opinion in *Snapp v. Unlimited Concepts, Inc.,* 208 F.3d 928, 933 (11th Cir. 2000), which expressly held that punitive damages are neither authorized nor recoverable under Section 216(b). Even though the Ninth Circuit has not decided whether punitive damages are available under Section 216(b), district courts within the Ninth Circuit have expressly adopted the "well-reasoned" and "persuasive" decision denying punitive damages articulated by the Eleventh Circuit in *Snapp*. *See Tumulty v. FedEx,* 2005 WL 1979104, at *11 (W.D. Wash. Aug. 16, 2005).

In *Snapp,* the Eleventh Circuit conducted an exhaustive analysis of the statutory language and legislative history of Section 216(b) to determine if punitive damages are an available remedy. *Id.* at 933-38. The Eleventh Circuit reasoned that the purpose of Section 216(b) is to compensate a plaintiff and that all forms of relief enumerated in Section 216(b) are strictly compensatory in nature. The court expressly held that allowing punitive

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016

damages would be inconsistent with Section 216(b)'s non-punitive purpose and express remedial language, especially since Section 216(a) provides a separate vehicle for punitive, criminal sanctions for willful violations of the FLSA. *Id.* at 934-35. The court further reasoned that because the FLSA's remedy provision is exactly the same as the ADEA's remedy provision set forth in 29 U.S.C § 626(b), and the ADEA prohibits recovery of punitive damages, Section 216(b)'s identical language should be similarly interpreted to preclude an award of punitive damages. *Lorillard v. Pons,* 434 U.S. 575, 579-80 (1978) (Section 626(b) of the ADEA was incorporated from Section 216(b) of the FLSA and should be interpreted the same); *Ahlmeyer v. Nevada Sys. of Higher Educ.,* 555 F.3d 1051, 1059 (9th Cir. 2009) ("punitive damages are not available under the ADEA"). Based on this thorough analysis, the Court in *Snapp* held that Congress set out a clear scheme disallowing punitive damages in FLSA retaliation cases – an interpretation that was faithful to congressional design and did not interpret the FLSA in a "narrow, grudging manner." *Id.* at 939.

Simply ignoring *Snapp* and the adoption of *Snapp* by district courts within the Ninth Circuit as "well-reasoned" and "persuasive," Plaintiff argues that this Court should instead adopt the Seventh Circuit's decision in *Travis v. Gary Cmty. Mental Health Ctr.,* 921 F.2d 108 (7th Cir. 1990). Plaintiff's conclusory argument is based on nothing more than the fact that the Ninth Circuit referred to *Travis* as "persuasive" in dicta in the *Lambert* decision. The Ninth Circuit, however, made this statement in dicta (and dicta only) nearly a decade before the Eleventh Circuit issued its detailed analysis in *Snapp.* Furthermore, as explained in *Snapp,* the Seventh Circuit's reasoning in *Travis* incorrectly states that punitive damages were permitted under Section 216(b) because there is no legislative history on the issue of availability of punitive damages. *Travis,* 921 F.2d at 111; *Snapp,* 208 F.3d at 934-937.

## IV.   CONCLUSION

Because Plaintiff failed to raise any material issue of fact via either direct or circumstantial evidence connecting her termination (or any other purported adverse action) to her complaints, Cox's Motion for Summary Judgment should be granted.

14

1  RESPECTFULLY SUBMITTED this 16th day of February 2010.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.


By: s/Nonnie L. Shivers
    Tibor Nagy, Jr.
    Nonnie L. Shivers
    2415 East Camelback Road, Suite 800
    Phoenix, Arizona 85016
    Attorneys for Defendant

**CERTIFICATE OF SERVICE**

1

2   I hereby certify that on the 16th day of February 2010, I electronically transmitted

3  the attached document to the Clerk's Office using the CM/ECF System for filing and

4  transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5  Carl R. Retter
6  4800 North 68th Street, Suite 171
   Scottsdale, Arizona 85251-1138
7  Attorneys for Plaintiff

8
   Cheri L. McCracken
9  2402 North 24th Street
10 Phoenix, Arizona 85008-1804
   Attorneys for Plaintiff
11

12
   s/Debra A. Irwin
13  _____

14 8166285.4 (OGLETREE)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16